UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 1/26/2018
```

---------------------------------------------------------X
                                        :

M.E. and T.E., individually and on behalf of    :
K.E., a minor,
                                     :

                     Plaintiffs,   :         15-CV-5306 (VSB)
                                     :

            - against -          :       **OPINION & ORDER**
                                     :

                                     :

New York City Department of Education,     :
                                     :

                    Defendant.   :
---------------------------------------------------------X

Appearances:

Lawrence D. Weinberg
Bloomfield, New Jersey
*Counsel for Plaintiffs*

Son K. Lee
*for* Zachary W. Carter
Corporation Counsel, City of New York
New York, New York
*Counsel for Defendant*

VERNON S. BRODERICK, United States District Judge:

       Plaintiffs M.E. and T.E. (collectively, the "Parents"), individually and on behalf of their

son, K.E. (the "Student"), filed a complaint against the New York City Department of Education

(the "DOE") pursuant to the Individuals with Disabilities Education Improvement Act, 20 U.S.C.

§ 1400, *et seq.* ("IDEA").  The Parents seek review of a decision by a New York State

Department of Education State Review Officer ("SRO"), which affirmed the decision of an

Impartial Hearing Officer ("IHO") that the school district's proposed plan would provide the

Student with a free appropriate public education ("FAPE"), and denied the Parents' request for

tuition reimbursement for K.E.'s tuition for the 2012-2013 school year at the Rebecca School, a

private school for children with disabilities.  Before me are the parties' cross-motions for

summary judgment.  (Docs. 18, 21.)[1]  Because I find that the SRO's decision was thorough and

well-reasoned, and that Plaintiffs have failed to demonstrate that (1) the 2012 IEP was

inadequate, and (2) the DOE's proposed placement at P010X was inadequate to meet K.E.'s

sensory needs, the Parents' motion, (Doc. 18), is DENIED, the DOE's motion, (Doc. 21), is

GRANTED, the SRO's decision is affirmed, and the case is dismissed.

## I.    Statutory and Procedural Framework

### A.    The IDEA and Claims for Tuition Reimbursement

Congress enacted the IDEA "to ensure that all children with disabilities have available to

them a free appropriate public education . . . designed to meet their unique needs . . . [and] to

ensure that the rights of children with disabilities and parents of such children are protected."  20

U.S.C. § 1400(d)(1)(A)–(B).  States receiving public funds under the IDEA are required to

provide a FAPE to "all children with disabilities."  20 U.S.C. § 1412(a)(1)(A); *see also Endrew

F. ex rel Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 993 (2017); *Bd. of Educ. v.

Rowley*, 458 U.S. 176, 179 (1982).  "A FAPE consists of special education and related services

tailored to meet the unique needs of a particular child, which are reasonably calculated to enable

the child to receive educational benefits, and provided in conformity with an individualized

education program, or IEP."  *Hardison v. Bd. of Educ.*, 773 F.3d 372, 376 (2d Cir. 2014)

(quoting *Reyes ex rel. R.P. v. N.Y.C. Dep't of Educ.*, 760 F.3d 211, 214 (2d Cir. 2014)).  This

means that "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP

reasonably calculated to enable a child to make progress appropriate in light of the child's

---

[1] Because Defendant's opposition to Plaintiff's motion for summary judgment included a request for dismissal of the
complaint, (Doc. 21, at 20), I interpret it as a cross-motion for summary judgment.

circumstances." *Endrew F.*, 137 S. Ct. at 999.  The crafting of an appropriate educational program for a specific child is thus a "fact-intensive exercise." *Id.*  "A focus on the particular child is at the core of the IDEA." *Id.*

Under the IDEA, school districts are required to "prepare an IEP for disabled students annually, and those IEPs 'must include the child's present levels of academic achievement and functional performance, goals and objectives for the child, and the special education and related services to be provided to the child so that he or she can advance toward attaining those goals and objectives." *Hardison*, 773 F.3d at 376 (quoting *Reyes*, 760 F.3d at 214); *see also Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107 (2d Cir. 2007) (noting that education and related services "must be administered according to an IEP, which school districts must implement annually"); *Honig v. Doe*, 484 U.S. 305, 311 (1988) (explaining that the IEP is a "centerpiece" of the IDEA); *Frank G. v. Bd. of Educ.*, 459 F.3d 356, 363 (2d Cir. 2006) (describing the IEP as "[t]he key element of the IDEA").  The IEP must be reviewed at least annually and revised in accordance with the child's needs.  *See* 20 U.S.C. § 1414(d)(2)–(4).  This review is conducted through collaboration among the parents of the child, educators, and specialists.  *See M.O. v. N.Y.C. Dep't of Educ.*, 793 F.3d 236, 239 (2d Cir. 2015).

New York has regulations that implement the IDEA, which "appear to track the IDEA closely." *Frank G.*, 459 F.3d at 363 (internal quotation marks omitted); *see also* N.Y. Comp. Codes R & Regs. Tit. 8, § 200.1 *et seq.*  In New York, IEPs are created by Committees on Special Education ("CSEs"), comprised of members appointed by school boards or trustees of the school district.  *See Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 123 (2d Cir. 1998) (citing N.Y. Educ. Law § 4402(1)(b)(1)).  CSEs "must include the student's parent(s), a regular or special education teacher, a school board representative, a parent representative, and others."

*R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012) (citing N.Y. Educ. Law § 4402(1)(b)(1)(a)).  "In developing a particular child's IEP, a Committee on Special Education is required to consider four factors:  (1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs."  *Frank G.*, 459 F.3d at 363 (quoting *Walczak*, 142 F.3d at 123).

When parents disagree with a CSE's IEP and believe that the State is not providing a FAPE to their child, "they may, at their own financial risk, enroll the child in a private school and seek retroactive reimbursement for the cost of the private school from the state."  *Gagliardo*, 489 F.3d at 111–12.  To seek such tuition reimbursement, a parent must first file a due process complaint with the Department of Education, which initiates administrative proceedings that include an impartial due process hearing before an IHO.  *See M.W. ex rel S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 135 (2d Cir. 2013) (citing 20 U.S.C. § 1415(b)(6), (f); N.Y. Educ. Law § 4404(1)).  "An IHO's decision may, in turn, be appealed to a [SRO]."  *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 225 (2d Cir. 2012); *see also* N.Y. Educ. Law § 4404(2).  Any party who wishes to challenge the SRO's final administrative decision has the right to seek review of it by bringing a civil action in federal court.  *See M.W.*, 725 F.3d at 135–36; 20 U.S.C. § 1415(i)(2)(A); N.Y. Educ. Law § 4404(3)(a).  On a federal appeal, the district court receives "the records of the administrative proceedings" and, if requested, hears additional evidence.  20 U.S.C. § 1415(i)(2)(C).  The district court then "grant[s] such relief as the court determines is appropriate," based on the preponderance of the evidence.  *Id.*

###### B.       *The Burlington/Carter Test*

The standard to determine eligibility for tuition reimbursement applied by district courts is the Supreme Court's three-pronged *Burlington/Carter* test, which looks to "(1) whether the

school district's proposed plan will provide the child with a free appropriate public education; (2) whether the parents' private placement is appropriate to the child's needs; and (3) a consideration of the equities."[2]  *C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 73 (2d Cir. 2014).  The school district bears the burden of proof on the first and third prongs of the *Burlington/Carter* test.  *See* N.Y. Educ. L. § 4404(1)(c).

The first prong—whether the IEP will provide a student with a FAPE—has two components.  *See C.F.*, 746 F.3d at 78–79.  "At the first step, courts examine whether there were procedural violations of the IDEA, namely, whether the state has complied with the procedures set forth in the IDEA.  Procedural violations only entitle parents to reimbursement if they impeded the child's right to a free appropriate public education, significantly impeded the parents' opportunity to participate in the decisionmaking process, or caused a deprivation of educational benefits."  *Id.* (citations and internal quotation marks omitted).  "Second, courts 'examine whether the IEP was substantively adequate, namely, whether it was reasonably calculated to enable the child to receive educational benefits.'"  *Id.* (quoting *R.E.*, 694 F.2d at 190).  "Substantive inadequacy automatically entitles the parents to reimbursement."  *Id.* (quoting *R.E.*, 694 F.3d at 190); *see also T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 160 (2d Cir. 2014) ("Substantive inadequacy automatically entitles the parents to reimbursement, as long as the parents' alternative placement was appropriate and equitable considerations favor reimbursement." (internal quotation marks omitted)).

In order to be substantively adequate, the IEP must be "likely to produce progress, not

---

[2] The Second Circuit describes the first two *Burlington* factors as involving a three-step analysis:  (1) "whether the school district has complied with the IDEA's procedural requirements," (2) "whether the IEP is reasonably calculated to enable the child to receive educational benefits," and (3) "whether the private schooling obtained by the parents is appropriate to the child's needs."  *Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 448–49 (2d Cir. 2015) (internal quotation marks omitted).  Whether the analysis is characterized as a two-step or three-step process is a difference of "enumeration, not of substance."  *Id.* at 448 n.6.

regression," and provide the student with an opportunity to achieve more than mere "trivial advancement." *M.O.*, 793 F.3d at 239 (quoting *M.H.*, 685 F.3d at 224). "A school district is not, however, required to furnish 'every special service necessary to maximize each handicapped child's potential.'" *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 195 (2d Cir. 2005) (quoting *Rowley*, 458 U.S. at 199). While the IEP must guarantee an "appropriate" education, it need not "provide[] everything that might be thought desirable by loving parents." *Walczak*, 142 F.3d at 132 (quoting *Tucker*, 873 F.2d at 567).

Furthermore, in evaluating whether a school is capable of implementing the IEP where a parent challenges a placement school the child never attended, courts "evaluate the challenges 'prospectively (i.e., at the time of the parents' placement decision),' and the challenges 'cannot be based on mere speculation.'" *Y.F. v. N.Y.C. Dep't of Educ.*, 659 F. App'x 3, 5 (2d Cir. 2016) (summary order) (quoting *M.O.*, 793 F.3d at 244). As the Second Circuit explained:

> While it is speculative to conclude that a school with the capacity to implement a given student's IEP will simply fail to adhere to that plan's mandates, it is not speculative to find that an IEP cannot be implemented at a proposed school that lacks the services required by the IEP. For example, it is not speculative to conclude that an IEP recommending a seafood-free environment, for a child with a life threatening seafood allergy, could not be implemented at a proposed school that was not seafood free. Nor is it speculative to conclude that an IEP recommending one-on-one occupational therapy, outside of the classroom, could not be implemented at a school that provided only in-class occupational therapy in a group setting.

*M.O.*, 793 F.3d at 244 (citations omitted).

## II.    Administrative Record

### A.    *Background*

K.E., who was five years old at the time of the CSE meeting that resulted in the IEP at issue in this action, is a student diagnosed with Autism Spectrum Disorder, Expressive Language Disorder, Sensory Integration Disorder, motor deficits, and difficulties with attention.

(Pls.' Ex. F-7.; Def.'s Ex. 1-1, 1-12.)[3]  In 2011, K.E. began attending the Rebecca School, which offered K.E. student-to-teacher classroom ratios from 8:1+3 to 9:1+4, as well as occupational therapy, speech language therapy, and mental health services, among other offerings. (Def.'s Ex. 6; Tr. 336:18-21.)  In December 2011, the Rebecca School prepared an interdisciplinary report of progress for K.E. (the "2011 Rebecca School Report").  (Def.'s Ex. 6.) On April 18, 2012, K.E's school district (the "District") convened a CSE meeting to generate an IEP for the 2012-2013 school year, relying at least in part on the 2011 Rebecca School Report, and issued the IEP on the same day.  (Def.'s Ex. 1; Tr. 158-60.)  On May 18, 2012, the Parents signed an enrollment contract with the Rebecca School for the 2012-2013 school year, and paid a non-refundable deposit of $7,500.  (Pls.' Ex. J.)

On June 6, 2012, Defendant informed the Parents of the proposed school placement at P010X @ P304X.  (Def.'s Ex. 7.)  The Parents and Joshua Noble, a social worker from the Rebecca School, visited the school on June 15, 2012 for approximately an hour, and during the visit were concerned about the school's ability to implement a sensory diet[4] and address K.E's sensory needs.  (Def.'s Ex. 8; Tr. 289-94, 302.)  On June 25, 2012, the Parents notified the CSE by letter that K.E. would remain in the Rebecca School for the 2012-2013 school year.  (Def.'s Ex. 9; Tr. 664-65.)  On May 20, 2013, the Parents initiated an administrative due process hearing seeking tuition reimbursement for the 2012-2013 school year.  (Pls.' Ex. A.)

---

[3] Citations to "Ex." refer to the parties' exhibits from the underlying impartial hearing in this case, and citations to "Tr." refer to pages of the transcript from that hearing.  "Pls.'" refers to Plaintiffs', and "Def.'s" refers to Defendant's.  To the extent I cite to specific page numbers in those exhibits, the page numbers will follow the format of those exhibits.

[4] During the impartial hearing before the IHO, the program director of the Rebecca School described a "sensory diet" as "sensory input" provided to the Student as a preventative measure throughout the school day so he could "stay regulated longer."  (Tr. 362-63, 376-77, 481-82.)

### B.    *CSE Meeting*

On April 18, 2012, the District convened a CSE meeting to conduct the student's annual review and develop an IEP for the 2012-2013 school year.  (Def.'s Exs. 1, 3.)  In attendance at the CSE meeting were the Parents and Student; June Forman, a Related Service Provider/Special Education Teacher; Craig Czarnecki, a District representative and school psychologist; Gloria Gonzalez, a parent member; Laura Gufarotti, a Rebecca School teacher; Michelina Leone Flick, a DOE social worker; and Joshua Noble.  (Def.'s Exs. 2, 3; Tr. 155-57.)  At the CSE convened for the 2012-2013 school year, the CSE reviewed K.E.'s previous IEP for the 2011-2012 school year, (Tr. 156, 227-28), and the 2011 Rebecca School Report, (Def.'s Ex. 6; Tr. 279-82), and heard from the Rebecca School teacher, a Rebecca School social worker, and the Parents, (Tr. 165-75).  During the CSE meeting, the Parents agreed that the Rebecca School teacher's description of K.E.'s "academic achievement, functional performance, and learning characteristics, as well as his social and physical development were . . . accurate."  (Tr. 172:2-13.)

The 2011 Rebecca School Report is thirteen pages long and provides a comprehensive overview of K.E.'s educational/functional emotional developmental levels, the school curriculum, and the occupational therapy, speech language therapy, and mental health services K.E. received.  (Def.'s Ex. 6.)  It also sets out K.E.'s long-term and short-term goals.  (*Id.*)  The 2011 Rebecca School Report also discusses K.E.'s proclivities toward sensory input and need to self-regulate when overwhelmed.  (*Id.*)

### C.    *2012 IEP*

The 2012 IEP classifies K.E. as a student with autism and provides an overview of K.E.'s present levels of performance and individual needs, measurable goals, reporting progress,

recommended special education programs and services, and other details.  (Def.'s Ex. 1.)  With

regard to K.E.'s academic achievement, functional performance, and learning characteristics, the

IEP states that K.E. was able to pick up "sight words," demonstrated "good comprehension

skills," could recognize numbers until 30, and was "a verbal child who typically uses full

sentences to communicate."  (*Id.* at 1-1.)  K.E. was also interested in his peers, creative, a good

sight word reader, able to answer "why" questions in books, responsive to adults' redirection,

and interested in reading books, sensory play, and physical anticipation games.  (*Id.*)

Additionally, K.E. was a "leader in group classroom activities."  (*Id.*)  However, he found certain

mathematical tasks challenging and "need[ed] multiple reminders from adults in order to remain

on task."  (*Id.*)  With respect to K.E.'s social development, the IEP states that K.E. was

"generally calm and regulated throughout the school day."  (*Id.*)  However, it notes that K.E.

would run around when "sensorily dysregulated," but telling him to stop and take a break, and

then sitting with him, taking deep breaths, and reminding him to slow down would help K.E.

regulate.  (*Id.*)  In those instances, K.E. would take approximately five minutes to regulate.  (*Id.*)

The IEP notes that K.E. "need[ed] adult support when he fe[lt] uncomfortable, frustrated or

upset."  (*Id.* at 1-2.)

With regard to K.E.'s physical development, the IEP states that he was "very sensory

seeking and will seek out sensory input from running, jumping on a trampoline and crashing on a

foof chair."  (*Id.*)  K.E. "w[ore] a compression vest 30 minutes on and 30 minutes off throughout

the day, to help increase body awareness and improve his ability to attend to classroom tasks

throughout the day."  (*Id.*)  K.E. also could "become up-regulated when playing fast paced

games such as chase," during which time "it [was] difficult to get him to slow down," although

he "[was] usually able to re-regulate with adult support."  (*Id.*)  The IEP further states that K.E.

"need[ed] to work on sensory integration, fine and gross motor [s]kills, body awareness, [and] visual spatial thinking." (*Id.*)

The IEP further includes annual goals with short-term instructional objectives and/or benchmarks. (*Id.* at 1-3 to 1-8.) These included eleven annual goals related to K.E.'s ability to maintain regulation and shared attention, logical abilities, word recognition, reading comprehension and fluency, math, science, ability to use sensory information, and speech and language therapy. (*Id.*) The annual goals were further broken down into approximately twenty-four short-term objectives, and noted how many times each annual goal would be measured per marking period and by whom. (*Id.*)

The IEP recommends that K.E. be placed in a special class in a specialized school with a ratio of six students, one special education teacher, and one paraprofessional or 6:1+1. (*Id.* at 1-2, 1-8.) The IEP additionally provides that K.E. receive speech-language therapy in a one-on-one setting for thirty minutes once a week, and in a two-on-one setting for thirty minutes twice a week, (*id.* at 1-2, 1-8 to 1-9); physical therapy in a one-on-one setting for thirty minutes twice a week, (*id.* at 1-2, 1-9); and occupational therapy in a one-on-one setting for thirty minutes three times a week, (*id.*). The IEP further notes that K.E. would be participating in an alternative assessment and be measured through student work samples, his student portfolio, and teacher observations. (*Id.* at 1-13.) It explains that the CSE considered placing K.E. in a special class in a community school with related services, but rejected that option because they found that would not offer K.E. the support he required on a twelve-month basis. (*Id.* at 1-14.)

Finally, the only objection made by the Parents that is noted on the IEP was that one of his parents was "concerned about an appropriate placement for the 2012-2013 school year." (*Id.*) No other objections to the CSE's recommendations were noted. At the IHO hearing, the

testimony further indicated that there were no objections to the recited goals stated in the IEP. (Tr. 174-75, 179, 182, 186-87, 188, 189, 191.)  There were also no objections voiced with respect to the related service mandates, (*id.* at 201), and the District's psychologist recalled that the Rebecca School teacher confirmed that the information contained in the 2011 Rebecca School Report was an accurate representation of K.E.'s abilities at that time, (*id.* at 159).  The District's psychologist did, however, recall that the Parents, the Rebecca School social worker, and the Rebecca School teacher expressed disagreement with the specific staffing ratio. (*Id.* at 195-97.)

### D.  *School Placement Offer and Tour*

On June 6, 2012, the DOE sent its Final Notice of Recommendation ("FNR"), which included its recommended placement at the P010X @ P304X School applying the recommendations noted in the IEP.  (Def.'s Ex. 7.)  On June 15, 2012, the Parents visited P010X together with Joshua Noble, a social worker from the Rebecca School.  (Def.'s Ex. 9-1.)  On June 25, 2012, T.E. wrote a letter to the CSE rejecting the FNR and describing their visit to P010X, specifically noting that:  (1) they were shown around the school by a behavior specialist; (2) observed that the classroom size was small for a 6:1+1 class; (3) were told that when a child needs a break they are placed in the school's hallway; (4) observed that there was no designated area for sensory breaks or sensory activities; (5) noticed that no other students appeared to be on a "sensory diet" as the behavior specialist presumed when the Parents referred to a "sensory diet" that they were referring to a meal plan; (6) found the lunchroom "very loud and rowdy" with no "effective crowd management control techniques;" (7) were unable to meet with the occupational, speech, and physical therapists; (8) were told that the school did not have a sensory

11

gym; (9) were told therapy is given in the classroom unless otherwise indicated on the IEP;[5] and

(10) found the school unable to inform them as to how the school would address K.E's language,

sensory, and motor deficits.  (*Id.* at 9-1 to 9-2.)  Ultimately, the Parents noted that "[t]he lack of

sensory equipment, a sensory gym, the inability to effectively address [K.E.'s] sensory issues,

and the failure of the school to explain to [them] how some of his other deficits would be

handled ha[d] led [them] to conclude that P010X is inappropriate."  (*Id.* at 9-2.)  They alerted the

DOE that they planned on continuing K.E.'s attendance at the Rebecca School and would be

seeking public funding for his tuition during the 2012-2013 school year.  (*Id.*)

### E.   *Due Process Complaint*

Plaintiffs filed a due process complaint on May 20, 2013 requesting an impartial hearing.

(Pls.' Ex. A.)  The complaint alleged that K.E. was denied access to a FAPE, (*id.* at A-2 ¶ 1), and

claimed that the Parents had voiced disagreement at the CSE meeting itself, (*id.* ¶ 5(c)), arguing

that the proposed program was inappropriate to address all of K.E.'s needs, (*id.* at A-3 ¶ 7).  The

complaint further stated that the concerns were "ignored by the team, depriving the parent of

meaningful participation in the review," (*id.* at A-2 ¶ 5(c)), and that they never received a copy

of the IEP, (*id.* ¶ 5(d)).  Therefore, the Parents sought a finding from the IHO that the CSE

meeting and subsequent IEP "substantively and procedurally flawed."  (*Id.* at A-3 ¶ 7(a).)

Among other claims, the Parents asserted that (1) the CSE failed to consider certain independent

evaluations, (*id.*), (2) the IEP was not reasonably calculated to confer an educational benefit on

K.E., (*id.* ¶ 7(b)), (3) the IEP failed to sufficiently identify K.E's present levels of performance

and include corresponding goals to address his needs, (*id.* at A-3 to A-4 ¶ 7(c)–(d)), (4) the CSE

---

[5] K.E.'s IEP indicates that his speech-language therapy, physical therapy, and occupational therapy would be held at a "[s]eparate [l]ocation" or the "provider's room."  (Def.'s Ex. 1-8 to 1-9.)

failed to perform appropriate evaluations and collect adequate and appropriate data, (*id.* at A-4 ¶ 7(e)), and (5) the CSE relied completely on information provided to them by the Rebecca School staff as well as goals from the 2011 IEP (*id.* ¶ 7(f)).  Additionally, the complaint noted that the CSE team was not duly constituted, (*id.* ¶ 8), failed to recommend an appropriate program, (*id.* at A-5 ¶ 9), and failed to offer an appropriate placement, (*id.* ¶ 10).)

### F.     *IHO's Findings*

An impartial hearing was convened and took place over nine non-consecutive days on June 27, 2013, July 23, 2013, September 30, 2013, October 2, 2013, October 7, 2013, November 18, 2013, December 20, 2013, March 7, 2014, and March 14, 2014.  (*See* IHO's Amended Findings of Fact and Decision, Case No. 144548 (Apr. 30, 2014) ("IHO Decision"), at 1–3.)  At the hearing, Plaintiffs called six witnesses:  the Parents, the Program Director at the Rebecca School, a social worker at the Rebecca School, an occupational therapist at the Rebecca School, and a teacher at the Rebecca School.  (*Id.* at 1–3.)  The District called three witnesses:  Craig Czarnecki, a school psychologist employed by the DOE who was present at the CSE meeting, the Principal of P010X, and Julio Morales, the crisis intervention teacher at P010X who gave the school tour to the Parents.  (*Id.*)

On April 28, 2014, the IHO issued a decision, and on April 30, 2014, issued an amended decision, denying the Parents' request for tuition reimbursement for the 2012-2013 school year at the Rebecca School.  (*Id.* at 18.)  After summarizing the background, both sides' respective positions, and the evidence presented, (*id.* at 4–10)—which included the P010X Principal's testimony regarding how the classrooms were arranged, what was provided to students, and the fact that K.E.'s IEP could be implemented at P010X, (*id.* at 9–10)—the IHO explained the DOE's burden and addressed each of the Parents' complaints, (*id.* at 10–17).

First, the IHO—after reviewing the CSE meeting, including the attendees and the applicable regulations—concluded that the CSE was properly constituted. (*Id.* at 11–12.) With respect to the Parents' complaint that they did not receive a copy of the IEP, the IHO noted that (1) the CSE mailed the IEP to the Parents before the school year, (2) it is the practice of CSE's to mail a copy to the non-public school program the student attends, and (3) the Parents did not inform the CSE that they did not receive the IEP until April 2, 2013. (*Id.* at 12.) Next, the IHO addressed the alleged failures of the IEP, including by first evaluating the Parents' contention that the CSE failed to rely on sufficient evaluative data. Noting that a CSE may rely on a wide range of assessment tools, the IHO stated that the CSE had sufficient information to evaluate K.E.'s needs, including recent evaluations and reports, notably the 2011 Rebecca School Report. (*Id.* at 12–13.) The IHO further explained that a CSE is not required to conduct a classroom evaluation as part of an annual review. (*Id.* at 13.) Moreover, the IHO found the Parents' contention that they were denied an opportunity to meaningfully participate in the CSE meeting unpersuasive, noting that the Parents had the ability to express their concerns and, in fact, did express their concerns, which were addressed in the IEP's development of K.E.'s goals. (*Id.* at 13–14.) The IHO explained that "mere parental disagreement with a school district's proposed IEP and placement recommendation does not amount to a denial of meaningful participation." (*Id.* at 14.) With regard to the Parents' contention that the program recommendation was pre-determined, the IHO referred to Dr. Czarnecki's testimony concerning how such decisions are made, and described his and his team's participation in the decision-making process. (*Id.* at 14–15.) Finally, the IHO addressed the Parents' claim that the IEP goals were insufficient and inappropriate and found that the goals were "directly responsive to [K.E.'s] academic needs and designed to provide him with educational benefits." (*Id.* at 15.) In this regard, the IHO also

14

noted the IDEA's requirements with respect to goals set by an IEP, and explained how the 2012 IEP fulfilled those requirements, notwithstanding the fact that the 2012 IEP did not contain a physical therapy goal.  (*Id.* at 15–16.)

Second, with regard to school placement, the IHO discussed the Parents' argument that the proposed public school placement would not have provided K.E. with a meaningful educational benefit and that the proposed placement would have been unable to implement the 2012 IEP.  (*Id.* at 16–17.)  Specifically, the IHO noted that the sufficiency of a program must be determined on the basis of the IEP itself as well as any explanations that might be offered as to how the IEP would be implemented at the proposed placement, and that a parent's speculation that a school will not adhere to the IEP is not a proper basis for unilateral placement.  (*Id.* at 16.) Addressing the Parents' specific contentions, the IHO found that:  (1) the Parents could have spoken to the related service providers if they had chosen to accept the placement and make an appointment with those providers and in any event, "neither the IDEA nor State regulations provide that a parent has a right to speak to them at all," (*id.*); and (2) the additional independent evaluations referenced by the Parents were never shared with the DOE, (*id.* at 17).[6]

## G.    *SRO's Determination*

One June 2, 2014, the Parents appealed the IHO Decision with respect to its request for tuition reimbursement.  (Verified Petition.)  The DOE submitted its verified answer on July 11, 2014.  (Verified Answer.)  On April 22, 2015, the SRO issued his decision, which affirmed the IHO's finding that the District had offered K.E. a FAPE for the 2012-2013 school year. (Decision of the State Review Officer, Application of a Child with a Learning Disability, No. 14-

---

[6] The IHO also found that the Parents were not entitled to reimbursement for the additional independent evaluations because there was no evidence that the Parents disagreed with the DOE's educational evaluation which was a prerequisite for obtaining reimbursement for an independent educational evaluation.  (IHO Decision 17)

078 (Apr. 22, 2015) ("SRO Decision"), at 24–25.)  The SRO noted that the Parents did not

appeal the IHO's determinations that (1) the April 2012 CSE was properly composed; (2) the

CSE provided the parents with a copy of the IEP; (3) the CSE relied on sufficient evaluative

information to develop the IEP; (4) the CSE was not required to conduct a classroom evaluation

of K.E.; (5) the CSE did not deprive the parents of the opportunity to participate in the

development of the IEP; (6) the CSE did not impermissibly engage in predetermination of the

school placement; and (7) the District was not required to reimburse the parents separately for

the cost of obtaining an independent evaluation of K.E.  (SRO Decision 8 n.2.)

### 1.  Adequacy of the IEP

The SRO first addressed the Parents' challenges to the 2012 IEP.  (*Id.* at 10–22.)  As an

initial matter, the SRO analyzed and evaluated the Parents' contention that the 2012 IEP failed to

accurately reflect K.E.'s present levels of performance, including K.E.'s sensory needs, need for

"brushing throughout the day," "sensitivity to loud noises," and information regarding K.E.'s

sensory diet and the equipment used to provide him with that sensory diet.  (*Id.* at 10–11.)  The

SRO found that the evidence in the record did not support the Parents' allegations.  (*Id.* at 11.)

Specifically, the SRO explained that the CSE had considered and relied upon the comprehensive

2011 Rebecca School Report, as well as input from the Parents, K.E.'s teacher, and a Rebecca

School social worker.  (*Id.* at 11–12.)  He then outlined in detail how the IEP adequately dealt

with K.E.'s sensory needs.  (*Id.*)  The SRO acknowledged that, although noted in the CSE's

meeting minutes, the IEP did not reference brushing throughout the day or sensitivity to loud

noises, but explained that the only reference to brushing in the 2011 Rebecca School Report was

in relation to K.E.'s occupational therapy needs and that there was no reference whatsoever to

any sensitivity to loud noises.  (*Id.* at 12–13.)  Next, the SRO addressed the Parents' assertion

that the CSE had omitted information about K.E.'s sensory diet and had also failed to identify, in either the management needs or supplemental aids sections of the 2012 IEP, the equipment used to provide K.E. with the sensory diet. (*Id.* at 13.) The SRO noted that the 2011 Rebecca School Report contained certain information relevant to this need, and confirmed that the 2012 IEP did not include the term "sensory diet" or identify any of the needed equipment in the listed sections. (*Id.*) The SRO concluded, however, that the 2011 Rebecca School Report did not provide any particularized information regarding the sensory diet beyond indicating that K.E. received this diet, which was developed by an occupational therapist and implemented through the use of a compression vest. (*Id.* at 13–14.) Therefore, the SRO found that although it failed to include the specific terminology, the CSE incorporated most of the relevant information regarding K.E.'s sensory needs in the 2012 IEP. (*Id.* at 14.) The SRO similarly found that the strategies or resources necessary to address K.E.'s sensory needs were also embedded within the IEP in various sections as well as the annual goals. (*Id.*) For all of these reasons, the SRO concluded that the CSE's failure to include or adopt specific language in the 2012 IEP did not constitute a failure to offer K.E. a FAPE. (*Id.* at 14–15.)

The SRO then turned to the Parents' argument that the IHO erred in finding that the CSE developed appropriate annual goals and short-term objectives in the 2012 IEP, as well as the Parents' position that the goals could not be implemented in the recommended 6:1+1 special class placement. (*Id.*) The SRO reviewed the applicable standards and concluded that the 2012 IEP was indeed designed to meet K.E.'s needs, enabled him to be involved in and make progress in the general education curriculum, and met his other educational needs resulting from his disability. (*Id.*) The SRO found that (1) the goals all included evaluation criteria as well as short-term objectives or benchmarks, (*id.* at 15–16); (2) despite the Parents' complaints, neither

the IDEA nor State regulations require that a CSE use an objective method of measurement to assess a student's progress on more than one evaluation schedule, (*id.* at 16); (3) the evidence did not support the Parents' contention that the IEP identified needs but failed to include goals to meet them, but, to the extent such deficiencies existed, these deficiencies would not support a finding that the IEP did not offer a FAPE, (*id.*); (4) with respect to specific goals allegedly not included, the District's psychologist had explained that if K.E. was expected to meet those goals at the end of the 2011-2012 Rebecca School year, it was not included in the 2012 IEP, and that the 2012 IEP accounted for the other goals, (*id.* at 16—17); (5) the 2012 IEP did not support the Parents' position that the CSE identified additional social/emotional needs in the IEP but did not include annual goals to address those needs, (*id.* at 17); (6) the 2012 IEP did not support the Parents' assertion that the CSE failed to develop annual goals to address K.E.'s need to improve his sensory integration, among other things, (*id.*); (7) the hearing record did not support the Parents' allegation that the CSE included annual goals in the IEP that did not correspond to an identified need, (*id.* at 17–18); (8) although the District psychologist testified that the omission of physical therapy-related goals was a clerical omission, the 2012 IEP still addressed K.E.'s physical therapy needs such that the omission of an annual goal related to those services did not result in a failure to offer K.E. a FAPE, (*id.* at 18); and (9) the evidence did not support the Parents' contention that the annual goals could not be implemented in a 6:1+1 special class placement, (*id.* at 18–19.)

The SRO next addressed the Parents' argument that the IHO had erred in finding that the 6:1+1 special class placement would provide K.E. with the intensive support or a reasonable equivalent to the support he received at the Rebecca School.  (*Id.* at 19–21.)  The SRO explained that the 6:1+1 class ratio, together with the services granted to K.E. in the 2012 IEP, were

designed for students whose needs are highly intensive, and found that the evidence in the hearing record did not support the Parents' contentions. (*Id.* at 19–20.) The District's psychologist testified at the hearing that a placement at this ratio was appropriate to meet K.E.'s needs, and stated his belief that the Rebecca School teacher who indicated otherwise had ultimately just wanted K.E. to remain in her school. (*Id.* at 20.) The SRO also noted that K.E.'s progress in the 2011-2012 school year was not shown to be solely attributable to the specific class ratio at the Rebecca School. (*Id.* at 21.) In fact, K.E.'s father explained that his progress in reading was attributable to K.E.'s reading in class and going to the library. (*Id.*) Therefore, the SRO concluded that "the evidence in the hearing record supports a finding that the April 2012 CSE's decision to recommend a 12-month school year program in a 6:1+1 special class at a specialized school with related services, strategies to address the student's management needs, and annual goals provided the student with sufficient support and was reasonably calculated to enable the student to receive educational benefits for the 2012-13 school year." (*Id.*)

Finally, the SRO found that the Parents' assertion that the CSE's failure to recommend parent training and counseling in the 2012 IEP constituted a failure to provide a FAPE was not meritorious. (*Id.* at 21–22.) The SRO explained that courts in this Circuit have found that failure to include parent counseling and training on an IEP does not constitute a denial of a FAPE where a district otherwise provided a comprehensive parent training component, noted that school districts in New York were required to provide parent counseling, and therefore districts remained accountable to provide such training regardless of the contents of an IEP. (*Id.* at 21.) The SRO concluded by stating that "the hearing record in this case does not contain any evidence upon which to conclude that the failure to recommend parent counseling and training in the . . . April 2012 IEP resulted-in whole, or in part-in a failure to offer the student a FAPE for the 2012-

13 school year." (*Id.* at 22.)

## 2. Ability of Proposed School to Satisfy the IEP

The SRO next addressed the Parents' challenges to the assigned public school site. (*Id.* at 22–24.) The SRO noted that "it is undisputed that the [P]arents rejected the assigned public school site that the student would have attended and instead chose to enroll [K.E.] in a nonpublic school of their choosing prior to the time the district became obligated to implement the April 2012 IEP." (*Id.* at 23.) Based in part on this fact, the SRO found that the Parents' claims were speculative and could not support a finding that the District failed to offer K.E. a FAPE for the 2012-2013 school year. (*Id.* at 22.) The SRO explained that when a student does not attend a recommended placement, challenges to an assigned public school site are generally speculative and that, in the circumstances present in this case, the appropriate inquiry should be into the nature of the program actually offered in the IEP, not a retrospective assessment of how that plan would have been implemented or a reliance on any information that post-dates the relevant CSE meeting. (*Id.* at 22–24.) The SRO finally concluded that "even assuming . . . that the parents could make such speculative claims or that the student had attended the district's recommended program at the assigned public school site, the evidence in the hearing record does not support the conclusion that the district would have violated the FAPE legal standard related to IEP implementation" in any material or substantial way. (*Id.* at 24.)

After determining that the evidence in the hearing record demonstrated that the District had sustained its burden in showing that it offered K.E. a FAPE for the 2012-2013 school year, the SRO decided that there was no need to address whether K.E.'s unilateral placement at the Rebecca School was an appropriate placement or whether equitable considerations support the Parents' request for relief. (*Id.* at 24–25.) The SRO then dismissed the Parents' appeal.

(*Id.* at 25.)

**H.**     *The Current Action*

On July 9, 2015, the Parents filed the Complaint in this action, appealing the SRO

Decision.  (Doc. 1)  On January 27, 2016, I received the administrative record, which was filed

under seal.  (Doc. 17.)  Plaintiffs filed a motion for summary judgment on February 8, 2016,

(Docs. 18–19), to which Defendant responded on March 9, 2016 and also asked for dismissal of

the complaint, (Docs. 20–21).  Plaintiffs filed a reply on April 11, 2016.  (Doc. 22).

**III.**   **District Court's Standard of Review**

A motion for summary judgment in the IDEA context is not an ordinary summary

judgment motion; rather it "functions as an appeal from an administrative decision."  *C.W.L. v.*

*Pelham Union Free Sch. Dist.*, 149 F. Supp. 3d 451, 461 (S.D.N.Y. 2015).  Thus, the existence

of a genuinely disputed issue of fact in an IDEA case will not necessarily defeat a motion for

summary judgment.  *See G.B. ex rel. N.B. v. Tuxedo Union Free Sch. Dist.*, 751 F. Supp. 2d 552,

570 (S.D.N.Y. 2010); *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d

Cir. 2005) ("[A] motion for summary judgment in an IDEA case often triggers more than an

inquiry into possible disputed issues of fact.").

In such an action, a court (1) reviews the record of the administrative proceedings; (2)

hears additional evidence at the request of a party; and (3) grants such relief as it deems

appropriate based on the preponderance of the evidence.  20 U.S.C. § 1415(i)(2)(C); *see also*

*Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 380 (2d Cir. 2003).  This standard of review

has been characterized as "modified de novo."  *E.S. v. Katonah-Lewisboro Sch. Dist.*, 742 F.

Supp. 2d 417, 424 (S.D.N.Y. 2010).  While a court must engage in an independent review of the

record and make the preponderance of the evidence determination, review of the state

administrative decisions is limited.  *See Rowley*, 458 U.S. at 205–06; *M.P. v. Carmel Cent. Sch. Dist.*, No. 15 CV 3432 (VB), 2016 WL 379765, at *3 (S.D.N.Y. Jan. 29, 2016).

Moreover, the IDEA requires "substantial deference to state administrative bodies on matters of educational policy," *Cerra*, 427 F.3d at 191, because "the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy," *Walczak*, 142 F.3d at 129 (internal quotation marks omitted).  In that regard, a court will not "substitute [its] own notions of sound educational policy for those of the school authorities which [it] review[s]."  *Rowley*, 458 U.S. at 206.  Where the SRO's review has been "thorough and careful," deference is "particularly appropriate."  *Walczak*, 142 F.3d at 129; *see also A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009) ("If the SRO's decision conflicts with the earlier decision of the IHO, the IHO's decision 'may be afforded diminished weight.' (quoting *Gagliardo*, 489 F.3d at 113 n.2)).

Consequently, "[c]ourts generally defer to the final decision of the state authorities, even where the reviewing authority disagrees with the hearing officer."  *M.H.*, 685 F.3d at 241 (quoting *A.C.*, 553 F.3d at 171).  However, such deference is not absolute, and the deference owed to an SRO's decision hinges on the quality of that opinion.  Reviewing courts must look to the factors that "normally determine whether any particular judgment is persuasive, for example whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court."  *Id.* at 244; *see also Endrew F.*, 137 S. Ct. at 993 ("[D]eference is based on the application of expertise and the exercise of judgment by school authorities.").

IV.   **Discussion**

Plaintiffs challenge both the adequacy of the 2012 IEP and the DOE's proposed

22

placement at P010X, stating that (1) the evidence objectively demonstrated that the 2012 IEP

could not meet K.E.'s sensory needs, (Pls.' Mem. 8–14);[7] and (2) the DOE did not demonstrate

that the proposed placement at P010X could meet those sensory needs given that there was no

sensory gym, no sensory program, and no qualified person to address K.E.'s sensory needs,

(*id.* at 14–17).  Plaintiffs have failed to demonstrate by a preponderance of the evidence that (1)

the 2012 IEP was inadequate, and (2) the DOE's proposed placement at P010X was inadequate

to meet K.E.'s sensory needs.  I find that the SRO Decision was a thorough and well-reasoned

decision, and it is affirmed.  Therefore the Parents' motion, (Doc. 18), is denied; the DOE's

motion, (Doc. 21), is granted; the SRO Decision is affirmed; and the case is dismissed.

>        **A.**     ***Adequacy of the 2012 IEP***

Although the Parents originally asserted procedural deficiencies before the IHO on the

CSE's formation of the 2012 IEP as a basis for their reimbursement claim, they do not include

any of these arguments in their current appeal.  (*See generally* Pls.' Mem.)  Rather, the Parents

allege certain substantive inadequacies, all of which center around the IEP's purported inability

to meet K.E.'s sensory needs and diet.  Specifically, the Parents claim that (1) the proposed

staffing ratio and service mandates were inappropriate to address all of K.E.'s needs, (*id.* at 8);

(2) the 2012 IEP merely addresses K.E.'s sensory needs in general terms even though his are

specific and severe, and the IEP did not provide for his sensory diet, (*id.* at 8–12); (3) the IEP's

recommended program did not offer adequate instruction, support, supervision, or services to

meet K.E.'s unique needs such that he could make educational progress, (*id.* at 8); (4) the IEP

failed to mention specific needs discussed during the CSE meeting, including K.E.'s need for

---

[7] "Pls.' Mem." refers to Plaintiffs' Memorandum of Law in Support of Cross-Motion for Summary Judgment, filed February 8, 2016.  (Doc. 19.)

brushing and joint compressions throughout the day and sensitivity to loud noises, and similarly neglected to mention other specific needs, such as his need for five to ten minutes of movement breaks every hour and for vestibular input from specific equipment in the sensory gym, (*id.* at 8–9); and (5) the IEP set forth educational needs or goals and provided no means of achieving those goals with respect to its goal that K.E. "improve his ability to use sensory information to understand and effectively interact with people and objects," (*id.* at 12–13). I will address these arguments in turn.

### 1. Staffing Ratio

Although the Parents reference their prior statement at the CSE meeting that the staffing ratio was inappropriate, (*id.* at 8), they fail to explain why such a ratio was inappropriate in their briefing and, in the document they cite, only state that the ratio is "too large" and "not appropriate" for K.E. to receive an educational benefit, (Pls.' Exs. A-5, A-6). These conclusory assertions are insufficient to call into question the staffing ratio in the 2012 IEP. In any event, the SRO addressed this claim at length, and carefully evaluated the state regulations, District psychologist's testimony, the Parents' respective testimony, and the Rebecca School teacher's testimony. (SRO Decision 19–21.) I find that the SRO properly reasoned that the denial of the precise classroom ratio afforded by the Rebecca School, as opposed to the 6:1+1 special class placement recommended by the 2012 IEP, was not a denial of a FAPE. In fact, the applicable regulations provide that the 6:1+1 special class placement granted to K.E. is designed particularly for students "requiring a high degree of individualized attention and intervention." *D.B. v. N.Y.C. Dep't of Educ.*, 966 F. Supp. 2d 315, 336 (S.D.N.Y. 2013) (quoting 8 N.Y.C.R.R. § 200.6(h)(4)(ii)(a)). Moreover, the District's psychologist specifically testified at the IHO hearing that during the CSE meeting it was explained to the Parents that it is not the goal to

recreate the staffing ratio of an independent private school but rather to find the most appropriate public education option, and also testified that the difference between the 6:1+1 ratio and the ratio implemented by the Rebecca School in practice is negligible.  (Tr. 418-19, 452-53.) Therefore, the state regulations and hearing evidence each support the SRO's conclusion that the recommended ratio did not constitute a denial of a FAPE.

### 2.  Sensory Needs

With respect to the second through fourth complaints noted above—which are encompassed within the Parents' blanket claim that the 2012 IEP did not address K.E.'s sensory needs or his sensory diet—I find that the SRO Decision deserves deference.  (*See* SRO Decision 10–15.)  Specifically, the SRO considered the applicable regulations as well as the CSE's reliance on the 2011 Rebecca School Report and the testimony of the Rebecca School teacher. (*Id.* at 10–12.)  The SRO found that the IEP was consistent with the 2011 Rebecca School Report and noted the numerous areas where the IEP did, consistent with the Report, delve into K.E.'s sensory needs and related behavior.  (*Id.* at 12.)  As noted above, the SRO explained that the information identified by the Parents as omitted from the IEP—namely, the need for brushing and the sensitivity to loud noises—were barely, if at all, mentioned in the 2011 Rebecca School Report.  (*Id.* at 12–13.)  In sum, the SRO found that the IEP provided most of the relevant information regarding K.E.'s sensory needs and contained the information necessary to address those needs, such that any failure to use specific terminology or present precise examples did not constitute a denial of a FAPE.  (*Id.* at 13–15.)  I find that there is no reason to disturb the SRO's thorough and well-reasoned decision.

### 3.  Goals

The Parents also challenge the SRO's finding with respect to the adequacy of the annual

goals, (SRO Decision 15–19), arguing that the IEP did not provide the means to achieve the specific goal that K.E. "improve his ability to use sensory information to understand and effectively interact with people and objects," (Pls.' Mem. 13 (quoting SRO Decision 6)).

"An IEP must include a written statement of measurable annual goals, including academic and functional goals designed to meet the student's needs that result from the student's disability." (SRO Decision 15 (citing 20 U.S.C. § 1414(d)(1)(A)(i)(II); 34 C.F.R. § 300.320(a)(2)(i); 8 NYCRR 200.4(d)(2)(iii)).)  Each annual goal must include "the evaluative criteria, evaluation procedures, and schedules to be used to measure progress toward meeting the annual goal during the period."  (*Id.* (citing 8 N.Y.C.R.R. 200.4(d)(2)(iii)(b); 20 U.S.C. § 1414(d)(1)(A)(i)(III); 34 C.F.R. § 300.320(a)(3)).)  "In this Circuit, courts are 'reluctant to find a denial of a FAPE based on failures in IEPs to identify goals or methods of measuring progress.'" *J.L. v. City Sch. Dist.*, No. 12 Civ. 1516(CM), 2013 WL 625064, at *13 (S.D.N.Y. Feb. 20, 2013) (quoting *P.K. v. N.Y.C. Dep't of Educ.*, 819 F. Supp. 2d 90, 109 (E.D.N.Y. 2011)).  "[T]he sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers."  *Grim,* 346 F.3d at 382.

Here, the IEP states clear annual goals and short-term objectives for K.E., including the goal regarding K.E.'s ability to use sensory information, by identifying the following short-term objectives as criteria for measurement:  sustaining "circles of communication during periods of frustration by staying in the interaction and not retreating to the periphery of the room with a co regulating adult and moderate verbal adult support;" coloring "for 5-10 continuous minutes with moderate verbal support" "[a]fter receiving deep pressure and proprioceptive input to his hands by a vibrating pen;" and K.E. asking "for help during sensorimotor play when he is frustrated or

if he cannot complete a task with moderate verbal support" "[i]n order to improve [K.E.'s]

ability to deal with sensory and emotional regulation across a variety of emotions and

environments."  (Def.'s Ex. 1-6; SRO Decision 16 n.9.)  The IEP also provided for a method of

measurement and a schedule for when progress would be measured.  (Def.'s Ex. 1-6.)  The SRO

Decision in this regard takes clear account of the record, and should be given deference.  *See*

*Walczak*, 142 F.3d at 129 ("Deference is particularly appropriate when . . . the state hearing

officers' review has been thorough and careful.")

### B.    *Appropriate Placement at P010X*

The Parents next argue that the proposed placement was not adequate to meet K.E.'s

sensory needs because (1) there is no sensory gym; (2) there is no sensory program in place or

qualified person to address K.E.'s sensory needs; (3) the school lunchroom was loud and rowdy;

and (4) the proposed placement could not implement the IEP, including but not limited to the

goals, academic management needs, social/emotional management needs, or behavior needs.

(Pls.' Mem. 14.)  The Parents acknowledge that the P010X Principal unequivocally testified that

the school did provide sensory services, possessed sensory equipment, and had programs and

systems in place to address K.E.'s sensory needs, but labeled the Principal's testimony vague and

minimal.  (*Id.* at 15.)  The Parents further noted that the individual who gave them the tour of the

school did not know what a sensory diet was, and that there was no testimony that P010X had

any of the equipment recommended by the IEP—namely, a trampoline, foof chair, compression

vest, proprioceptive input, adaptive physical education, and work on sensory integration.  (*Id.* at

16.)  Finally, the Parents challenged the IHO and SRO Decisions by noting that neither decision

analyzed whether P010X could implement the sensory supports listed in the IEP, and instead

relied on their finding that the Parents' claims to the contrary were speculative.  (*Id.*)

As previously explained, "challenges to a school district's proposed placement school must be evaluated prospectively (i.e., at 'the time of the parents' placement decision') and cannot be based on mere speculation." *M.O.*, 793 F.3d at 244 (quoting *R.E.*, 694 F.3d at 195). "While it is speculative to conclude that a school with the capacity to implement a given student's IEP will simply fail to adhere to that plan's mandates, it is not speculative to find that an IEP cannot be implemented at a proposed school that lacks the services required by the IEP." *Id.* (citation omitted).

As an initial matter, the observations by the Parents that there was no sensory gym and that the cafeteria was "loud and rowdy" are more properly categorized as complaints with respect to the 2012 IEP itself—addressed above—as opposed to how the school would be able to implement the IEP.[8]  Indeed, one of Plaintiffs' main complaints about the 2012 IEP was that the description of K.E.'s sensory needs in the IEP was "generic," (Pls.' Ex. A-3), and the 2012 IEP, while providing an adequate sense of K.E.'s sensory needs, did not state that he required a separate sensory gym, (Def.'s Ex. 1).  Similarly, the Parents claimed that the IEP did not properly address K.E.'s sensitivity to loud noises.  (*See* SRO Decision 12–13.)

The Parents' second complaint—that there was no sensory program in place or qualified person to address K.E.'s sensory needs—is simply not borne out by the record, (*see* Pls.' Mem. 15 (acknowledging the P010X Principal's testimony that the school did provide sensory services, possessed sensory equipment, and had programs in place to address K.E.'s sensory needs)), nor was this conclusion necessarily a logical deduction from the school tour that resulted—at least in part—in the Parents' decision to unilaterally place K.E. at the Rebecca School.  In fact, the

---

[8] A Rebecca School teacher described their sensory gym as "basically a big open space where we are able to use suspended equipment such as swings.  So there are mats and padding on the floor so that if the kids do fall they are safe.  It's really used by the therapists to help provide more input in a therapeutic way."  (Tr. 1037:14-20.)

Rebecca School social worker testified that they were shown the room used for occupational and physical therapy, (Tr. 772:20-21), and Julio Morales, who gave the Parents the school tour, testified that the occupational and physical therapy room does have "some sensory equipment," (*id.* at 1306:23-24). Additionally, the assertion that P010X did not possess the necessary sensory support is precisely the type of argument that has been routinely rejected by courts in this Circuit, since the fact that parents may not have observed certain equipment during their site visit does not demonstrate that the school lacked the equipment or was unable to obtain the equipment necessary to implement the IEP. *See, e.g.*, *G.S. v. N.Y.C. Dep't of Educ.*, No. 15-CV-5187 (RA), 2016 WL 5107039, at *15 (S.D.N.Y. Sept. 19, 2016) (collecting cases); *N.K. v. N.Y.C. Dep't of Educ.*, 961 F. Supp. 2d 577, 592 (S.D.N.Y. 2013) ("The fact that Plaintiffs did not observe any sensory equipment on their site visit is insufficient to demonstrate that P226 lacked such equipment or that the school would not obtain the equipment necessary to implement [the student's] IEP should [the student] attend the school."). Moreover, Julio Morales's purported confusion with respect to the meaning of a sensory diet does "not come close to proving that the school was 'factually incapable' of implementing the IEP, and could thus be properly excluded from consideration." *G.S.*, 2016 WL 5107039, at *15 (internal quotation marks omitted); *see also E.B. v. N.Y.C. Dep't of Educ.*, No. 15-CV-4998 (KBF), 2016 WL 3826284, at *9 (S.D.N.Y. July 12, 2016) ("Because plaintiff's claims are based on her one-time observations and subjective conclusions, they are not sufficient to overcome the presumption that the proposed placement was capable of implementing the IEP."). In addition, the Parents' assertion that P010X would be unable to meet K.E.'s sensory needs is also pure speculation under the relevant legal standard, as is their general claim that the school could not meet K.E.'s other, broader needs. *See G.S.*, 2016 WL 5107039, at *15 (parents' statements that the school would be unable

to fulfill the IEP's service mandates and could not meet the student's sensory needs, among other challenges, were "precisely the types of speculative arguments rejected in *M.O.*"); *N.M. v. N.Y.C. Dep't of Educ.*, No. 15-CV-1781 (JMF), 2016 WL 796857, at *8 (S.D.N.Y. Feb. 24, 2016) ("[A] claim based on what a school 'would not have' done—as opposed to a claim based on what the school *could not do*—is speculative and barred under *R.E.* and *M.O.*").

**V.      Conclusion**

For the reasons explained above, Plaintiffs have failed to demonstrate by a preponderance of the evidence that (1) the 2012 IEP was inadequate, and (2) the DOE's proposed placement at P010X was insufficient to meet K.E.'s sensory needs.  I find that the SRO Decision was thorough and well-reasoned, and I agree with the SRO Decision and do not find that the proposed school placement constituted a denial to K.E. of a FAPE.  Therefore, Plaintiffs are not entitled to tuition reimbursement for the 2012-2013 school year.  Accordingly, Plaintiffs' summary judgment motion is DENIED, and Defendant's cross-motion for summary judgment is GRANTED.  The Clerk of Court is directed to terminate the open motions at Document 18 and Document 21 and close the case.

SO ORDERED.

Dated: January 26, 2018
       New York, New York

Vernon S. Broderick
United States District Judge